UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 09-152-P-H |
| | ) | |
| | ) | |
| MICHAEL PRESSEY, | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED PARTIAL DECISION ON MOTION TO SUPPRESS

Michael Pressey, charged with one count of knowingly possessing firearms, namely, improvised explosive devices qualifying as destructive devices as defined in 26 U.S.C. § 5845(a) and (f), which were not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d), 5841, 5845(f), and 5871, *see* Indictment (Docket No. 18), moves to suppress evidence of his identity, as well as statements that he made to Maine Drug Enforcement Administration ("MDEA") agent Jeffrey Calloway on August 17, 2009, on grounds, *inter alia*, of his asserted arrest without probable cause and Calloway's alleged questioning of him without benefit of the warning required by *Miranda v. Arizona*, 384 U.S. 436 (1966), *see* Motion To Suppress Evidence ("Motion") (Docket No. 39) at [1], [12-14].[1]

The defendant had raised three other grounds for suppression of evidence: (i) that a search warrant affidavit did not contain probable cause for a search of the premises located at

---

[1] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

1

240 Park Avenue in Portland, Maine, (ii) that the issuing judge was not authorized to issue a search warrant, and (iii) that the search exceeded the scope of the warrant. *See* Motion at [2-12]. By partial ruling dated December 17, 2009, Judge Hornby denied the Motion to the extent predicated on those three grounds and ordered that the matter be scheduled for an evidentiary hearing as to the remaining two grounds. *See* Partial Ruling on Defendant's Motion To Suppress ("Partial Ruling") (Docket No. 47).

In accordance with Judge Hornby's ruling, an evidentiary hearing was held before me on the two remaining grounds for suppression on January 13, 2010, at which the defendant appeared with counsel. The government tendered one witness and otherwise relied on two documents filed by the defendant in support of his motion, an Affidavit and Request for a Search Warrant ("Affidavit") (Docket No. 39-1), and a Search Warrant (Docket No. 39-2). The defendant neither tendered witnesses nor offered exhibits. At the close of the evidence, counsel for both sides argued orally. I now recommend that the following findings of fact be adopted and that, as to the two remaining bases for suppression, the Motion be granted to the extent that the defendant seeks exclusion of statements made to Calloway in the absence of a *Miranda* warning, and otherwise denied.

**I. Proposed Findings of Fact**

Calloway, employed by the Portland Police Department, has been assigned for the past five years to the MDEA. In the summer of 2009, he assisted MDEA agent Cheryl Holmes in a drug trafficking investigation at 240 Park Avenue in Portland, Maine. Calloway was among the law-enforcement team that conducted surveillance during controlled purchases of drugs using a confidential informant, or CI. The defendant was among those observed to have participated in

drug trafficking during controlled buys by the CI on or about July 24, 2009, and August 16, 2009. *See* Affidavit, Statement of Probable Cause, ¶¶ 33-37, 52-57.

On August 17, 2009, agents executed a warrant to search the residence and premises of 240 Park Avenue. The warrant had been issued by a Maine Superior Court Justice on the strength of an affidavit by Holmes detailing, among other things, observations made during the July 24 and August 16 controlled buys. *See id*. Calloway was assigned to attempt to conduct interviews of any occupant of the premises after a Portland Police Department Special Reaction Team ("SRT") had made entry. Prior to August 17, Holmes had informed Calloway that the defendant lived on the second floor of 240 Park Avenue and that the defendant's grandmother lived on the first floor.

Calloway waited across the street from 240 Park Avenue while the SRT made its entry. Some SRT members then exited the apartment, and one gave Calloway the go-ahead to enter. Calloway walked up a set of stairs to an outside door, which opened into a kitchen. Upon his entry, he observed two people in handcuffs standing with their backs to the kitchen stove, a black male whom he recognized as William Hopkins, and a white male who he correctly assumed, based on the information earlier provided by Holmes, was the defendant. Several uniformed SRT officers remained in the kitchen, as well.

Calloway asked the defendant if the apartment was his. The defendant said that it was.[2] Calloway then asked the defendant whether a bedroom that he had observed from the kitchen was his. The defendant said that it was. Calloway asked these questions because he was looking

---

[2] On direct examination, Calloway testified that he asked whose apartment it was, and the defendant stated that it was his. However, on cross-examination, Calloway clarified that he addressed this question specifically to the defendant, asking if the apartment was his.

3

for a more private place to conduct interviews than the kitchen, where armed SRT members remained.

Calloway first asked Hopkins to accompany him to the bedroom. Hopkins did so, and indicated that he did not want to talk to Calloway. After this encounter, which lasted no more than a few seconds, Calloway returned Hopkins to the kitchen and informed SRT members that he "can go." By that, Calloway meant that Hopkins could go to the Cumberland County Jail. Calloway then asked the defendant to come into the bedroom. The defendant did so. Calloway asked if the defendant would talk to him, and the defendant stated that he felt that he would be better served if he had counsel present for that occasion. This ended the conversation, which lasted no more than a couple of minutes. The defendant returned to the kitchen, and Calloway told SRT members that he could go as well, again meaning go to jail. Both Hopkins and the defendant were removed from the apartment and taken to jail. The search of the apartment, in which Calloway participated, then commenced. Calloway had no further conversation that day with the defendant.

During Calloway's brief encounter with the defendant, the defendant was cooperative and polite. At no point did Calloway tell the defendant that he was free to leave or that he was not under arrest. Nor did Calloway, or any other officer to his knowledge, advise the defendant of his *Miranda* rights before the defendant was taken to jail. Calloway agreed that it was fair to say that the defendant was in custody from the time he was handcuffed upon the SRT's entry into the apartment until the time that he eventually was bailed from jail.

At the hearing, the parties stipulated that no *Miranda* warning was given to the defendant at any time during the above-described encounter.

## II.  Discussion

### A.  Probable Cause To Arrest

At oral argument following the close of the evidentiary hearing in this matter, counsel for the government contended that the Holmes affidavit supplied probable cause to arrest the defendant prior to the SRT's entry into his apartment, just as Judge Hornby ruled it had supplied probable cause to search his apartment.  *See* Partial Ruling at 2-3.  Defense counsel made no argument that probable cause was lacking, seemingly conceding the point that it existed.  In any event, to the extent that the point is not conceded, I recommend that the court deny the motion to suppress on this basis.  As the government's counsel observed, paragraphs 36, 37, 53, and 57 of Holmes' affidavit detail agents' contemporaneous observations of the defendant's participation in controlled drug purchases by a CI.  *See* Affidavit, Statement of Probable Cause, ¶¶ 36-37, 53, 57; *see also* Partial Ruling at 2-3.  In the parallel context of the defendant's challenge to the issuance of the search warrant, Judge Hornby rejected his contention that the Holmes affidavit relied on the uncorroborated statements of an informant of unknown reliability that the defendant had committed a crime.  *See* Motion at [2-3], [13]; Partial Ruling at 2-3.

There was probable cause prior to the entry of the defendant's apartment on August 17, 2009, to believe that he was engaged in the illegal distribution of cocaine.

### B.  Lack of *Miranda* Warning

"*Miranda* warnings must be given before a suspect is subjected to 'custodial interrogation.'"  *United States v. Taylor*, 985 F.2d 3, 7 (1st Cir. 1993).  The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render her 'in custody.'"  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted).  Whether a person can be considered to

have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id*. (citation omitted).

The determination whether there was such a restraint on freedom of movement hinges "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id*. at 323. *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted).

"Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

For *Miranda* purposes, "'[i]nterrogation' includes not only the asking of direct questions but also means any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Taylor*, 985 F.2d at 7 (citation, footnote and internal punctuation omitted); *see also, e.g., Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know

are reasonably likely to elicit an incriminating response from the suspect.") (footnotes omitted). By contrast, a voluntary utterance – uncoerced by direct questioning or its functional equivalent – does not implicate the protections of *Miranda*. *See, e.g., United States v. Shea*, 150 F.3d 44, 48 (1st Cir. 1998), *recognized as abrogated on other grounds, United States v. Mojica-Baez*, 229 F.3d 292 (1st Cir. 2000) ("No evidence suggests that the FBI coerced Shea into making these statements. Indeed, the record shows that all of these statements were spontaneous utterances, which we deem to be admissible.").

I conclude that the defendant was "in custody" for *Miranda* purposes when he was handcuffed upon SRT members' entry into his apartment. Police at that point already had probable cause to arrest him. As Calloway conceded on cross-examination, the defendant was not free to leave police custody at any time from the point that he was handcuffed until the point that he was bailed from jail. When Calloway told fellow officers that Hopkins and the defendant could "go" after his brief discussions with each of them in the bedroom, he meant "go to jail." A reasonable person in the defendant's shoes, whose apartment had been entered by a team of uniformed, armed officers on the strength of a search warrant, who had been immediately placed in handcuffs, and who had been asked to talk to police, would not have considered himself free to leave. At hearing, counsel for the government argued that the defendant was only temporarily detained until following the attempted interview, at which point he was placed under arrest. However, I discern no material difference between the defendant's circumstances when he was first placed in handcuffs and his circumstances, a short time later, when he was released from the bedroom to be sent to jail.

In the conceded absence of any *Miranda* warnings, Calloway directly asked the defendant two questions, whether the apartment was his and whether the bedroom was his. The

7

defendant did not "volunteer" his affirmative responses, as the government suggests, *see* Government's Objection to Defendant's Motion To Suppress ("Objection") (Docket No. 44) at 13-14. Rather, they were elicited in direct response to Calloway's questions.

At hearing, counsel for the government emphasized that Calloway's questions cannot fairly be characterized as "interrogation," given that he merely sought to find a suitable interview space. By this, she may have meant to suggest either that Calloway's innocent purpose is dispositive of the question of *Miranda* violation and/or that his questions were the sort "normally attendant to arrest and custody[,]" removing them from the purview of *Miranda*. *Innis*, 446 U.S. at 301.

Calloway's innocent purpose is not dispositive. "The question [of whether an officer's questions are reasonably likely to elicit an incriminating response in a particular situation] is an objective one; the officer's *actual* belief or intent is relevant, but it is not conclusive." *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989) (emphasis in original); *see also, e.g., United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) ("[T]he test is whether a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response.").

Nor has the government, which bears the burden of proving *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), made a persuasive case that Calloway asked the defendant questions normally attendant to arrest and custody. There was no testimony that it was Calloway's usual practice, or the usual practice of police, to ask the sorts of questions asked of the defendant for the purpose of obtaining interview space.

My research does disclose that questions as to an individual's residence or address typically do not constitute "interrogation" for *Miranda* purposes. *See, e.g., United States v.*

8

*Glover*, 211 Fed. Appx. 811, 814 (10th Cir. 2007) ("When an officer asked the occupants if the house was theirs, Mr. Glover stated the house was his. An inquiry about the residence of a suspect is one normally attendant to arrest and custody and not subject to *Miranda*.") (citation and internal quotation marks omitted); *United States v. Edwards*, 885 F.2d 377, 385 (7th Cir. 1989) ("In our opinion questions such as 'what is your name?' and 'where do you live?' will not usually constitute interrogation within the meaning of *Miranda*."). Yet, I find no such authority with respect to the pointed question whether a bedroom within a residence is that individual's bedroom. In any event, any exception to the *Miranda* rule for questions seeking to elicit "simple identification information of the most basic sort (*e.g.*, name, address, marital status)" is itself subject to an exception if such questions are reasonably likely to elicit an incriminating response. *Doe*, 878 F.2d at 1551-52.

In this case, officers had sufficient information, prior to entering the defendant's apartment, to conclude that the apartment likely contained evidence of the commission of a crime, albeit drug trafficking rather than possession of an improvised explosive device. A question posed to the defendant as to whether the apartment and/or bedroom were his was reasonably likely to elicit an incriminating response.[3] *See id*. The defendant's answers to those questions accordingly should be suppressed.[4]

---

[3] The government does not challenge the defendant's characterization of his responses as incriminating. *See* Objection at 13-14.

[4] In connection with its argument that there was probable cause to arrest the defendant, the government asserted that the facts of his identity and occupancy of the second floor apartment at 240 Park Avenue were known to agents at the time of issuance of the search warrant, prior to the defendant's arrest. *See* Objection at 13 n.3. In so noting, the government assumedly alluded to the so-called "independent source" rule, pursuant to which "evidence acquired by an untainted [source] which is identical to evidence unlawfully acquired is admissible." *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009) (citation and internal punctuation omitted). If the court agrees with my recommendation to suppress information obtained *via* Calloway's questions, the government will be free, should it so choose, to seek admission of that information through the "independent source" rule.

### III.  Conclusion

For the foregoing reasons, I recommend, with respect to the two bases for suppression referred to me for an evidentiary hearing and recommended decision, that the Motion be **GRANTED** to the extent that the defendant seeks exclusion of statements made to Calloway in the absence of *Miranda* warnings, and otherwise **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 10th day of February, 2010

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge